## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | § | | |
| | § | | |
| **VS.** | § | | |
| | § | | |
| **ABDULRAHMAN ODEH** | § | **CIVIL NOS.** | **3:13-CV-04299-P** |
| **MUFID ABDULQADER** | § | | **3:13-CV-04300-P** |
| **GHASSAN ELASHI** | § | | **3:13-CV-04301-P** |
| **MOHAMMAD EL-MEZAIN** | § | | **3:13-CV-04302-P** |
| **SHUKRI ABU BAKER** | § | | **3:13-CV-04303-P** |
| | § | **CRIM. NO.** | **3:04-CR-00240-P** |

## JOINT MEMORANDUM IN SUPPORT OF
## MOTION UNDER 28 U.S.C. §2255 TO VACATE,
## SET ASIDE, OR CORRECT SENTENCE BY A
## <u>PERSON IN FEDERAL CUSTODY</u>

GARY A. UDASHEN
Texas State Bar No. 20369590

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax
gau@sualaw.com

Attorney for Defendants

## TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

Grounds Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ground One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

All defendants received ineffective assistance of counsel at trial.

Argument and Authorities

Ineffective Assistance of Counsel - Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6

Factual Basis for Ineffective Assistance at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

a.    Control of Zakat Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

b.    Evidence From Members of the Committees . . . . . . . . . . . . . . . . . . . . 8-10

c.    Professor Nathan Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-15

d.    Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

e.    Selective Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

f.    Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

g.    Entrapment Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20

h.    Mistake of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

i.    Vagueness of Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Ground Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

All defendants received ineffective assistance of counsel on appeal.

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Legal Standards for Ineffective Assistance of Counsel on Appeal. . . . . . . . . . . . . . 23-24

     a.    Failure to Challenge Sufficiency of Evidence on Appeal

Legal Standard on Sufficiency of Evidence . . . . . . . . . . . . . . . . . . . . . . . 25

Direction and Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-37

Meaning of Control or Direct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-39

Significance of Witnesses Conclusory Claims That Hamas
Controlled Zakat Committees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-41

Conclusion on Sufficiency of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 41

     b.    Vagueness of Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     c.    Failure to Raise the Court of Appeals Erroneous Harm Analysis on Petition
for Writ of Certiorari. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ground Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

There is no evidence that Hamas controlled the Zakat Committees.  Thus, the
defendants are actually innocent.

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

Actual Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     a.    Introduction:  *Herrera* and *Schlup Claims* . . . . . . . . . . . . . . . . . . . . . 43-44

     b.    Due Process, Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

     c.    Procedural Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

     d.    Substantive Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-49

Evidence Establishing Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49-50

Ground Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

The government suppressed exculpatory evidence.

Argument and Authorities

     a.    Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-52

     b.    Factual Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-53

Ground Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

The Court of Appeals engaged in an improper harm analysis on appeal resulting in a denial of due process.

Argument and Authorities .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54-55

Ground Six . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

The prosecution was brought against the defendants for improper purposes resulting in a denial of due process and equal protection.

Argument and Authorities .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-56

Necessity for an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL NOS.  3:13-CV-04299-P** |
| **SHUKRI ABU BAKER (02)** | § | **3:13-CV-04300-P** |
| **MOHAMMAD EL-MEZAIN (03)** | § | **3:13-CV-04301-P** |
| **GHASSAN ELASHI (04)** | § | **3:13-CV-04302-P** |
| **MUFID ABDULQADER (07)** | § | **3:13-CV-04303-P** |
| **ABDULRAHMAN ODEH (08)** | § | **CRIM. NO.  3:04-CR-00240-P** |

**MEMORANDUM IN SUPPORT OF**
**MOTION UNDER 28 U.S.C. §2255 TO VACATE,**
**SET ASIDE, OR CORRECT SENTENCE BY A**
**PERSON IN FEDERAL CUSTODY**

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES SHUKRI ABU BAKER, MOHAMMAD EL-MEZAIN, GHASSAN ELASHI, MUFID ABDULQADER and ABDULRAHMAN ODEH and submit this Joint Memorandum in Support of Motion to Vacate, Set Aside, or Correct Sentence By A Person in Federal Custody and would show the following:[1]

## INTRODUCTION

The government prosecuted the Holy Land Foundation for Relief and Development ("HLF"), three of its former officers, a former employee, and a performer at fundraising events for providing charitable support - food, school supplies, monthly  stipends, and the like - to Palestinians in the West Bank through local zakat (or "charity") committees that, according to the government, Hamas controlled.  There was no evidence that HLF provided funds directly to Hamas or that its funds were used (or intended to be used) to support suicide bombings or other violence.  The key factual issues

---

[1]This memorandum addresses the issues that are common to all five defendants.

Joint Memorandum in Support of Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody - Page 1

at trial were (1) whether Hamas in fact controlled the zakat committees, and if, so, (2) whether the defendants knew of the Hamas control and acted willfully, which the district court defined in part as with a "bad purpose either to disobey or disregard the law." 3R.6992.

A first trial produced a hung jury on most counts, acquittals as to one defendant, and no convictions. At a second trial before a different judge, the jury returned guilty verdicts on all counts. The district court sentenced the five defendants to prison sentences ranging from 15 to 65 years.

Appeal was taken to the Fifth Circuit Court of Appeals. The Court found error in the improper admission of four items of evidence but found the error harmless. A Petition for Writ of Certiorari was filed with the Supreme Court which was denied.

## **GROUNDS RAISED**

GROUND ONE:  All defendants received ineffective assistance of counsel at trial.

GROUND TWO:  All defendants received ineffective assistance of counsel on appeal.

GROUND THREE:  There is no evidence that Hamas controlled the Zakat Committees.

GROUND FOUR:  The government suppressed exculpatory evidence.

GROUND FIVE:  The Court of Appeals engaged in an improper harm analysis on appeal resulting in a denial of due process.

GROUND SIX:  The prosecution was brought against the defendants for improper purposes resulting in a denial of due process and equal protection.[2]

## **GROUND ONE**

All defendants received ineffective assistance of counsel at trial.

---

[2]Some separate additional grounds are raised concerning defendant Abdulqader and Odeh.  These grounds are addressed in separate memorandum.

Joint Memorandum in Support of Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody - Page 2

## ARGUMENT AND AUTHORITIES

**Ineffective Assistance of Counsel - Governing Law**

It is well established that a defendant is entitled to the effective assistance of counsel as required by the Sixth Amendment to the United States Constitution. *Gideon v. Wainwright,* 372 U.S. 335 (1963); *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *Summerlin v. Schiro*, 427 F.3d 623 (9th Cir. 2005). Effective assistance is denied if, "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984).[3] *See*, *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (failure to file a suppression motion is deficient representation); *Lafler v. Cooper*, 132 S.Ct. 1376 (2012) (performance prong of *Strickland* test requires a defendant to show that counsel's representation fell below an objective standard of reasonableness); *Harrington v. Richter*, 131 S.Ct. 770 (2011) (question is whether attorney's representation was deficient under prevailing professional norms).

To establish deficient performance, the defendants must show that their counsel's representation "fell below an objective standard of reasonableness." *Lambright v. Schiro*, 490 F.3d 1103, 1116 (9th Cir. 2007) (quoting *Strickland*, 466 U.S. at 688). The court applies a highly deferential standard to the examination of counsel's performance, making every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *See Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997). To satisfy the prejudice requirement, the record must demonstrate that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,

---

[3]The *Strickland* standard applies to retained as well as appointed counsel. *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in

the outcome." *Id.*  That is, "a criminal defendant alleging prejudice must show 'that counsel's errors

were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart*

*v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).    This in not an

outcome-determinative test.  *Nix v. Whiteside*, 475 U.S. 157 (1986).  The question is not whether

a defendant would have more likely than not received a different verdict but for counsel's

performance, but whether, "he received a fair trial, understood as a trial resulting in a verdict worthy

of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 454 (1995).[4]

      It has been held that, even if an attorney's manner of conducting a trial was trial strategy, it

can be so ill-chosen as to render a trial fundamentally unfair.  *United States v. Rusmisel*, 716 F.2d

301, 310 (5th Cir. 1983).  A single error of counsel may support a claim of ineffective assistance if

the error was of such magnitude that it rendered the trial fundamentally unfair.  *See Nelson v. Estelle*,

642 F.2d 903, 907 (5th Cir. 1981).  A decision not to present a particular defense is unreasonable

unless counsel has explored the issue sufficiently to discover the facts that might be relevant to

making an informed decision.  *Stankowitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004);

*Lambright v. Schiro*, 490 F.3d 1103, 1106 (9th Cir. 2007); *Thomas v. Varner*, 428 F.3d 491 (3rd Cir.

2005) (failure to object to in-court identification was not objectively reasonable and constitutes

ineffective assistance); *Siehl v. Grace*, 561 F.3d 189 (3rd Cir. 2009) (ineffective assistance when

counsel stipulated that fingerprint belonged to defendant).

---

[4]Although *Kyles* involves the determination of prejudice following the State's suppression of evidence favorable to the defense (*Brady* error) (*Brady v. Maryland*, 373 U.S. 83 (1963)) the standard for prejudice employed in such cases is adopted from, and is identical to, that in *Strickland*.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  In both circumstances, to demonstrate prejudice, a petitioner must show that "there is a reasonable probability that . . . the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-434 (quoting *Bagley*, 473 U.S. at 682).

Although *Strickland* requires a showing of prejudice, it does not require the defendant to show that his counsel's deficient performance, *more likely than not*, altered the outcome of the case. *Strickland*, 466 U.S. at 693. The result at trial "can be rendered unreliable, and hence the proceeding itself unfair, even if the error of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. at 694. Thus, the *Strickland* requirement that a defendant must show a "reasonable probability" that the outcome of trial would have been different absent error of counsel does not mean that the defendants must show a better than 50-50 chance. *Strickland* merely imparts the idea that "showing some conceivable effect on the outcome of the proceeding" would not suffice to overturn a conviction. 466 U.S. at 693. Instead, according to *Strickland*, a "reasonable probability" means a reasonable chance that counsel's mistake could have affected the outcome of the case, based upon concrete and identifiable facts and circumstances reflected in the record.

In preparing for the defense of a criminal accusation, counsel is expected to familiarize himself with the facts of the case and with the applicable standards of law attendant to the various anticipated legal questions which will be presented at trial. *Magill v. Dugger*, 824 F.2d 879, 866 (11th Cir. 1987). Counsel has an obligation to contact the witnesses and review the reports in advance of trial so that a fair determination of the evidence can be made. *Williams v. Taylor*, 529 U.S. 362 (2000). Failure to follow up on established leads or known defenses, and failure to be prepared to effectively present such defenses, is not excusable. *See Battenfield v. Gibson*, 236 F.3d 1215, 1228 (10th Cir. 2001); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *Harris, by and through Ramseyer v. Wood*, 64 F.3d 1432, 1435, 1436 (9th Cir. 1995); *Henderson v. Sargent*, 926 F.2d 706 (8th Cir. 1991); *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991), *cert. denied*, 502 U.S. 964 (1991); *Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir. 1998). While counsel cannot

be expected to literally overturn every stone in investigating the case, *compare Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir.), *cert. denied*, 522 U.S. 907 (1997), *Strickland* presupposes a thorough legal and factual investigation of the case. *Strickland*, 466 U.S. at 691.

Although decisions concerning the quantity and quality of evidence to present are certainly strategic considerations for trial counsel, any such strategy must be based upon a thorough grasp of the facts and applicable law and a thorough investigation of the case. *Burger v. Kemp*, 483 U.S. 776, 794 (1987). However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *Id.* (*citing Strickland*, 466 U.S. at 690-91). The failure to present certain types of critical evidence may not be condoned if it stems from trial counsel's lack of preparation. *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003). The failure to call witnesses cannot be deemed a strategic choice if counsel had not interviewed the witnesses and was, thus, unprepared. *See also Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992) (stating "our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"); *Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987); *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987). Any trial "strategy" that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991).

**Factual Basis for Ineffective Assistance at Trial**

The following are the ways in which counsel were ineffective at trial:

a.    **Control of Zakat Committees**

The primary issue in this case was whether Hamas controlled the Zakat Committees listed in the indictment. Defense counsel for each of the defendants rendered ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution by inadequately addressing this issue, in the following ways:

Defense counsel did challenge the testimony of the government's expert witnesses under Rule 702 of the Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U. S. 579 (1993) and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999). However, a specific challenge to the witnesses of knowledge as to whether Hamas controls the Zakat Committees was not pursued.

Under Rule 702(b), an expert can only testify if his testimony is based on sufficient facts or data. *See*, *Forman v. Pillsbury*, 753 F.Supp. 14 (D.D.C. 1990) (court may look behind expert testimony to determine whether it has adequate factual or scientific testimony); *Tyger Const. Co., Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994) (excluding expert testimony that had no factual support); *United States v. 319.88 Acres of Land*, 498 F.Supp. 763 (D. Nev. 1980) (where the opinion of an expert is based on erroneous assumption of fact or law, the evidence is incompetent); *Paz v. Brush Engineered Materials*, 555 F.3d 383 (5th Cir. 2009) (where an expert's opinion is based on insufficient evidence the analysis is unreliable).

Government witnesses Leavitt, Avi and Shorbagi claimed that Hamas controlled Zakat Committees.[5] However, they had no factual basis for this testimony. A complete examination of this testimony is found under Ground Two in this Memorandum. The testimony of both Leavitt and Avi that Hamas controlled the Zakat Committees was inadmissible as expert testimony since there

---

[5]It does not appear that the government relied on any other witnesses in an attempt to prove control of the Zakat Committees by Hamas. However, to the extent that there was even a slight suggestion by any other witnesses that Hamas controlled the committees, the other witnesses had even less knowledge than these three witnesses.

was no factual basis for the testimony. Defense counsel's failure to object on this basis constitutes ineffective assistance of counsel.

Shorbagi's testimony was not expert testimony. Under Rule 701, Fed. Rules of Evidence, an opinion of a witness not testifying as an expert is limited to evidence that is:

a.    rationally based on the witnesses's perception;

b.    helpful to clearly understanding the witnesses testimony or to determining a fact in issue, and

c.    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

As the record demonstrates, Shorbagi had no basis for his claim that Hamas controlled the Zakat Committees. Rather, he was simply following the government's script for his testimony. This testimony was not rationally based on his perception since he had no factual basis for the testimony.[6]

Moreover, the testimony of all three witnesses was pure speculation. In fact, no government witness had any factual basis to claim that Hamas controlled the Zakat Committees.

b.    **Evidence From Members of the Committees**

Evidence was available that would have conclusively established that Hamas did not control these Zakat Committees. This evidence was from persons actually on the Zakat Committees and from the community where the Zakat Committees were located. Neither the government or the defense presented any testimony from any person with actual personal knowledge as to how the committees operated that would have addressed the question of whether Hamas controlled the committees. The government did not present any witnesses with the personal knowledge because

---

[6]The Court of Appeals found Shorbagi's testimony on this issue to be inadmissible hearsay.

this testimony would have been contrary to their argument. The defense attorneys failure to present this evidence was ineffective assistance of counsel.

Affidavits from the following persons are submitted as exhibits. These persons were all members of the Zakat Committees named in the indictment during the relevant time period:

- Muhammad Eed Muhammad Mesh

- Abd-El Azez Magames Abd-El Azez Saafen

- Hashen Sadek Abd El Fattah Alnatshen

- Hamzeh Theeb Mustafa Abu-Sbaiha

- Ammar Tawfik Ahmad-Badawi Khojiyyeh

- Ghayyat Raafat Hafez Khairy

- Walid Abdallatif Solayman Abu Libdeh

- Riyad Rashid Hamad Walwil

- Abd Al Rahin Mohammad-Radi Taha Hanbali

- Adil Rifaat Salih Yaeesh

- Yasin Ahmad Amin Al-Saadi

- Walid Ibrahim Khaled Jarror

- Bilal Khamis Yusef Abu-Sofirah

These affidavits all state the following:

1. That the affiant was a member of a particular West Bank Zakat Committee.

2. That this affiant was not associated with Hamas.

3. Hamas did not control the Zakat Committee.

4. That the Committees operated independently

These affidavits are crucial evidence that go directly to the main issue in the case. They demonstrate that persons with personal knowledge should have been called as witnesses to testify at the trial. Had this occurred, the jury would almost certainly have found these defendants not guilty.

c.     **Professor Nathan Brown**

At the first trial, which resulted in a mistrial, the defense called expert Nathan Brown. Professor Brown was a very effective witness who had an expertise concerning the Zakat Committees. Unlike the government expert, he had actually visited some Zakat Committees. He had also done extensive investigation and research into the Zakat Committees. His testimony refuted the government's argument that Hamas controlled the Zakat Committees. However, the defense attorneys did not call Professor Brown in the second trial, even though he was the best, most effective witness from the first trial. A copy of his testimony from the first trial is submitted as an Exhibit.

At the first trial, Brown testified that he is a Professor of Political Science and International Affairs at George Washington University. He is also director of the Middle East Studies Program and the Institute for Middle East Studies at the University. Professor Brown also is a senior associate for the Carnegie Endowment for International Peace. (p. 8-10).

Professor Brown further explained his background and basis for knowledge of the Zakat Committees in the West Bank. This included work in Palestine and additional academic study. He has also published on this topic. (p. 10-18).

Professor Brown's testimony included the following:

"Q.     Are you familiar with the role and reputation of these Zakat Committees in Palestinian society?
A.     Yes.

Q.      And how are they regarded?

A.      They are regarded as one of the most reputable organizations, honest, having integrity, a sense of social and public purpose.

Q.      Have there been any studies in that regard?

A.      Yes.  I mean there is an awful lot of polls in Palestinian society.  I can remember one conducted specifically by the Palestinian Studies Program at Palestinian University in which Palestinians were asked which institutions in Palestinian society do you trust the most.  The first on the list, if I remember correctly, were Palestinian universities.  The second was Zakat Committees.

Q.      And how are they regarded by people who are not religious Muslims?

A.      As authentic homegrown organizations as opposed to sometimes organizations that were set up because of foreign funding. (p. 36)

. . .

Q.      And why are they -- in your experience, why are they trusted and regarded - trusted and legitimate organizations?

A.      Well, a couple of reasons.  First, they have very low administrative expenses.  They essentially take in money from donations and give it out.  And that requires very little administrative overhead.  For the most part, undertaking big ambitious projects with consultants and that sort of thing.  And second, because they give to the poor and needy without regard to religion or sometimes political affiliation.

Q.      Why is that important in Palestinian society?

A.      Palestinian society is deeply divided along geographic lines, political lines, West Bank, Gaza, Nablus.  It's divided sometimes between family lines and tribal lines, and there very few institutions Palestinians have that stand outside or don't get sucked into those various divisions.

Q.      And are they regarded as having a partisan or political orientation, the Zakat Committees?

A.      No. (p. 37)

. . .

Q.      And in your research, did you find whether or not these Zakat Committees were identified with a particular political party?

A.      No.  I found no mention of them in that context.

Q.      So would you consider them part of HAMAS?

A.      No.

Q.      Would you consider them part of the HAMAS social network?

A.      No.

Q.      Would you consider them part of - Withdrawn.  Would you consider them to be controlled by HAMAS?

A.      No.

Q.      Or operating for the benefit of HAMAS?

A.      No.

Q.      And are those conclusions - Those are opinions that you are stating as an expert?

A.      Yes.

Q.      Are they perceived in the Palestinian society as being a part of HAMAS?

A.      I never heard any mention of Zakat Committees in the context - from a Palestinian in the context of them being part of HAMAS.  (pp. 38-39).

. . .

Q.      Now, with respect to the Zakat Committees, what is their traditional scope of what they do?

A.      They help the poor.

Q.      And what type of oversight does the Ministry of Waqf perform with respect to these committees?

A.      The ministry has the authority to appoint the director and also its regular - I believe their annual financial reports from the committee.

Q.      And do they license them as well?

A.      Yes.

Q.      And do they have authority to discipline them or act against them if they are not in compliance?

A.      Theoretically, they would.  I know of no occasion where they exercise that authority, but theoretically they would.  (pp 41-42).

. . .

Q.      You earlier stated that your opinion is that the Zakat Committees are not part of HAMAS or not perceived as part of HAMAS and what impact on your opinion - Withdrawn.  You testified earlier that the Zakat Committees are not in your opinion part of HAMAS or perceived as part of HAMAS.  What impact, if any, on that opinion is there of the relationship between the Zakat Committees and the Palestinian Authority?

A.      Well, the Palestinian Authority is legally overseeing these committees.  It's coordinating with them.  The Ministry of Social Affairs which was regarded, fairly or unfairly, as a fairly political ministry - that is, as one who was closely associated with Fatah and steered benefits towards party members - was still coordinating with them.  So that would lead me to see Zakat Committees as willing easily to work with the Palestinian Authority despite HAMAS's very tenuous relationship with the Palestinian Authority.  (pp. 44-45).

. . .

Q.      Now, you have read the testimony of someone who testified under the name of Avi?

A.      Yes.

Q.      And you read his testimony in this case?

A.      Yes.

Q.      And how would you evaluate his approach and his evaluation with respect to the Zakat Committees?

A.      I think part of what he does is necessary to do and may be done well, but I think it's incomplete.  What he talked about doing was gathering information from many different sources.  I think that's absolutely critically important.  He talked about using the press, using public reputation, tracing the appointments of important individuals.  That's all important.  He left out I think any prior political or social context and certainly any comparative context.  He seemed unfamiliar with broader

research on similar kinds of phenomena in neighboring societies or even the category of Zakat Committees within Palestinian societies.

Q.      Do you think with respect to his historical knowledge - How would you rate that?

A.      Based on his own description, it would seem to be limited, and I noticed at least one place where he referred to, for instance, the PA in 1990 or 1991, at a time when it didn't exist.  So I thought he was very knowledgeable about the period, very recent period, but had never taken the time to study the issue in historical data.

Q.      And he testified that he was unfamiliar with the 1990 Jordanian Zakat Law?

A.      Yes, I saw that, and I was surprised because his background was in law, and one of the first questions - certainly not the only question, but one of the first question - that I would ask if I'm doing research on an organization and trying to determine its status is under what legal authority is it operating?

Q.      And the fact that he doesn't know Arabic, would you consider that a limitation?

A.      It's a limitation.  He does know some Arabic.  (pp. 45-46)

. . .

Q.      Did you find inaccuracies with respect to some of his descriptions of people and organizations with respect to their relationship with HAMAS?

A.      I saw things that I thought were wrong.  (p. 47)

. . .

Q.      With respect to Mr. Avi's theories that he proposed, can you evaluate them generally in terms of sort of the purpose that he said of the HAMAS social wing?

A.      Yes.  I was a little uncomfortable because it seemed to me that he set up a standard which would lead almost anything the Zakat Committee do to be seen as supporting HAMAS.  For instance, if the Zakat Committees give to people who are associated - (p. 50).

. . .

Q.      And with respect to the hearts and minds theory, did you find in your research and your expertise on Palestinian institutions and zakat committees in particular - did you find evidence that HAMAS was getting credit for the work of the zakat committees?

A.      I never found anybody who saw the zakat committees that way, no.

Q.      And in terms of your review of Palestinian newspapers, what were your findings with respect to that notion that HAMAS gets the credit for these zakat committees?

A.      I never saw any evidence in Palestinian Authority newspapers aligned with the government or even those that were aligned with the Islamist society.  (p. 54)

. . .

Q,      And you have read the testimony of Dr. Levitt?

A.      Yes.

Q.      And you have read his book, HAMAS?

A.      Yes.

Q.      And as an academic, what is your opinion of his work in that book?

A.     It's not a real scholarly book.  A real scholarly book would weigh research more, and he relies on the information of others and doesn't include evidence that would undermine his conclusions.

Q.     How would you evaluate his sources?

A.     His sources are mixed.  He's clearly relying on English language sources or on those sources that have been translated.  He also relies on sources that I think would be of uncertain reliability.  He relies for instance on an awful lot of western press.  It's fine to use that on occasion, but I think he relies a little bit too extensively on it.  These are reporters who don't necessarily have a deep knowledge of the local society.  At one point, he even relies on the Wikipedia as a source for the meaning of a specific term, and as an academic I'm not comfortable with that.

Q.     Have you heard of the Center for Special Studies?

A.     Yes.

Q.     And he relies heavily on that?

A.     Very.

Q.     And could you tell us what the Center for Special Studies is?

A.     As I understand, it's an organization of retired Israeli intelligence officials and analysts, and they basically grew out of a body that was set up to memorialize Israeli intelligence people who had been killed in action so that they have sort of a public education arm.  When the Israelis started seizing these documents, especially in 2002, they turned a lot of them over to this organization which then began translating some of them and issuing reports based on them.

Q.     And how would you characterize the translations?

A.     Uneven and sometimes inaccurate.  I mean they would sometimes translate or imply that every mention of word "martyr" means suicide bombers when it was not, and there were problems like that with their work.

Q.     What was the reaction in Israel to the Center for Special Studies?

A.     As I understand, it has provoked some controversy because essentially what they are doing is issuing political reports, and the Israelis feel that they have to reply on a professional intelligence apparatus, and to be mixing politics and intelligence can lead to very bad results.  You start making bad policy decisions.

Q.     And how would you rate it with respect to a source of Wikipedia?

A.     About the same.  Wikipedia can be good, can be bad, but you don't know where it came from.  This is a little bit different.  You know where it came from.  It's basically trying to serve a specific political purpose, but I would not rely - As an academic, I would not use either.  I would never cite either as an authority.

Q.     And Dr. Levitt's book?

A.     He relies extensively on this Center for Special Studies.

Q.     I want to talk about the particular zakat committees that you visited.  You went to the Ramallah Zakat Committee?

A.     That's right.

Q.     Do you remember when generally?

A.     It was the Spring of 2000.  I believe it was April.

Q.     And who did you meet with?

A.    I met with the director.  I don't remember the name.  And there was somebody else who was there who I believe was on their board.

Q.    Did you see anything there that would lead you to believe that it was controlled by HAMAS?

A.    No.  (pp. 66-69).

**d.    Motion to Suppress**

Failing to pursue a motion to suppress the evidence obtained from HLF's offices without a warrant by challenging the blocking order.  The Court of Appeals upheld the District Court's denial of the defendant's motion to suppress this evidence and noted that the defense had not challenged the blocking order.  The Court of Appeals referred to a Ninth Circuit case that had found constitutional problems with a blocking order and implied that a challenge to the blocking order in this case would have been well founded.  The failure to make this challenge constitutes ineffective assistance.

Specifically, the Fifth Circuit made the following comments which indicate that defense counsel should have pursued a different theory on the motion to suppress.

> "We hold that the district court correctly denied the suppression motion but for different reasons.  The defendants do not challenge the blocking order under the Fourth Amendment.  As we will explain, we conclude that the defendants' privacy interests were greatly reduced by the unchallenged blocking order, that the Government had a strong special need to act quickly to prevent asset flight, and that the Government's movement of HLF's property into storage until obtaining a warrant was a minimal intrusion into the defendants' diminished privacy interests.  Under these circumstances, the Government's conduct did not violate the Fourth Amendment."
>
> . . .
>
> Because the defendants do not challenge the blocking order, OFAC's implementation of it must be assessed by comparing the order's effect on the defendants' privacy interests with any special needs of the Government under IEEPA.  We think this balancing of interests does not support suppression of the evidence in this case.
>
> . . .
>
> In *Al Haramain*, the Ninth Circuit held that the special needs exception did not apply in the context of the Government's issuance of a blocking order under IEEPA.  The court noted that '[t]he exception requires a weighing of the nature and extent of the privacy interest at hand against the nature and immediacy of the government's

concerns and the efficacy of the procedures employed in meeting those concerns.' *Al Haramain*, 660 F.3d at 1043 (citing *Bd. of Educ. v. Earls*, 536 U.S. 822, 830-34, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002)). The court there concluded that the private entity had a substantial privacy interest that was severely restricted by the blocking order because the order effectively shut down all business operations indefinitely, and that the Government failed to show why a warrant should not be required when balanced against that interest. *Id*. at 1045-46.

We agree with the Ninth Circuit's assessment of the debilitating effect of a blocking order, but because the defendants have not challenged the order in this case, our analysis begins at a different point than *Al Haramain*, and the applicable balancing of interests yields a different result. Here, the unchallenged blocking order gave the Government complete control over both HLF's assets and the premises and reduced the defendants' interests to a minimum. As the Ninth Circuit recognized in *Al Haramain*, the significant effects of a blocking order are 'by design.' *Id*. at 1045 ('[T]here is no limited scope or scale to the effect of the blocking order.'). Indeed, a 'designation [as a SDT] is not a mere inconvenience or burden on certain property interests; designation indefinitely renders a domestic organization financially defunct.' *Id*. at 1032. Further, '[a] blocking order effectively shuts down the private entity.' *Id*. at 1045."

**e.    Selective Prosecution**

Not raising a selective prosecution argument. The government selectively prosecutes Muslims and Muslim groups under the statutes used in this case and under similar statutes. Non-Muslims are rarely, if ever, prosecuted for this alleged conduct. A prima facie case of selective prosecution could have been made that would have allowed the defense to engage in the necessary discovery to prove that this prosecution was pursued based on the defendant's Muslim religion and was in violation of due process. See argument under Ground Six and material submitted as exhibits.

**f.    Exculpatory Evidence**

Not requesting that the Court order the prosecutor to review for exculpatory evidence, the taped conversations that the government had of various defendants' and the material seized by the Israeli defense forces and kept in Israel of items seized from the Zakat Committees. While the defense made efforts to review this evidence themselves, they did not ask for an order to the

prosecutors for them to fulfill their obligation to review this material for exculpatory evidence.  Had the prosecutors been ordered to review this material for exculpatory evidence, evidence would have been discovered that showed that the defendants were attempting to comply with the law and that Hamas did not control the Zakat Committees.  This evidence would have included conversations involving the defendants that showed efforts to be in compliance with the law and a belief that they were in compliance.  The evidence taken from the Zakat Committees by the Israeli military certainly included pro Fatah material that would indicate that Hamas did not control the Zakat Committees. See argument under Ground Five.

**g.     Entrapment Defense**

Defense counsel were ineffective for not requesting an entrapment defense instruction or pursuing an entrapment defense.

In *United States v. Theagene*, 565 F.3d 911 (5th Cir 2009), the court stated:

"The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with government agents." *Bradford*, 113 F.3d at 521.  Entrapment occurs when the government causes an offense to be "committed by a person other than one ready to commit it." *Id*.  The government may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).

Entrapment operates through a burden shifting regime.  The defendant must first "make out a prima facie case that the government's conduct created a substantial risk" of entrapment. *Bradfield*, 113 F.3d at 521.  This requires the defendant to make a prima facie showing of (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense. *Id*. at 521.  He can do so "by identification or production of evidence." *Nations*, 764 F.2d at 1080.  A defendant who meets this burden is entitled to an entrapment instruction, whereupon the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense before the government first approached him. *Bradfield*, 113 F.3d at 521-22; *see also Jacobson*, 503 U.S. at 548-49, 112 S.Ct. 1535; *United States v. Rodriguez*, 43 F.3d 117, 125 (5th Cir. 1995).

The question of entrapment is generally one for the jury, rather than for the court." *Matthews*, 485 U.S. at 63, 108 S.Ct. 883 (citing *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)).

The evidence raising the entrapment defense is as follows:

The United States first banned financial support for Hamas on January 23, 1995, when President Clinton issued Executive Order 12947 under IEEPA. 60 Fed. Reg. 5079 (Jan. 25, 1995).[7] The Executive Order implemented the ban by naming Hamas a Specially Designated Terrorist ("SDT"). 7R. 7283, 7301. E.O. 12947 gave the Treasury Department authority to designate additional SDTs, including "persons determined . . . to be owned or controlled by, or to act for or on behalf of, any of the foregoing persons," including Hamas. E.O. 12947, § 1(a)(iii), 60 Fed. Reg. at 5079; 7R. 7301-02. The designation process serves two critical functions: as the head of Treasury's Office of Foreign Assets Control ("OFAC") explained, designation of any entity "alert[s] the world to [its] true nature" and "cut[s] it off from the U.S. financial system." DX 1052; 7R. 7306.[8]

Beginning with the designations of Hamas and others in January 1995, the Treasury Department maintained a public list of all designated persons and entities, including SDTs and FTOs. 7R. 7277-78, 7302. The list included persons and entities designated because they were determined to be "owned or controlled by, or to act of or on behalf of" Hamas. 7R. 7305. Hamas and several Hamas officials appeared on the Treasury Department list. But the government never designated as an SDT or FTO (and placed on the list) any of the Zakat Committees, or anyone connected with the Zakat Committees. 4R. 3860-62; 7R. 7344. The Treasury Department thus never

---

[7] Thus, the earliest unlawful conduct alleged in the indictment is January 25, 1995. 3R. 7055, 7060. It was undisputed that appellants' conduct before that date did not violate any federal criminal law. As the government conceded in its opening statement, "[I]t didn't become illegal to support Hamas or to fund Hamas until 1995." 4R. 3563.

[8] The United States further criminalized financial support for Hamas on October 8, 1997, when the State Department designated it's a Foreign Terrorist Organization ("FTO") and thus brought it within the prohibitions of 18 U.S.C. §2339B.

formally determined - and "alert[ed] the world" - that those committees were "owned or controlled by, or . . . act[ed] for or on behalf of" Hamas.[9]

In February 1995, shortly after E.O. 12947 designated Hamas an SDT, Elashi (on behalf of HLF) and representatives of other American Muslim organizations met at the Treasury Department in Washington, C.D. with the head of OFAC and other Treasury officials. HLF and the other organizations sought guidance on "the new executive order and its implications for charitable giving by American Muslims." 7R. 7298, 7312-15. The Treasury officials responded that the Department "was not going to make a determination for them as to who they could or couldn't send money to beyond the entities already listed in Executive Order 12947." 7R. 7315. The Department declined to provide a list of approved entities - a so-called "white list." 7R. 7352-54. The Treasury officials referred Elashi and the other attendees to a White House press release about E.O. 12947, which stated that the Executive Order was "intended to reach charitable contributions to *designated organizations* to preclude diversion of such donations to terrorist activities." GX OFAC 4 (emphasis added); *see* 7R. 7319-20. As noted, the West Bank Zakat Committees were not among the "designated organizations."

In a call that the government secretly recorded on April 23, 1996, Baker and Elashi discussed the possibility that the Treasury Department might designate and list the Zakat Committees. Baker emphasized that if Treasury placed the committees on the list, HLF could no longer distribute charity through them. GX Baker Wiretap 11; 7R. 7053-56. Baker told Elashi that if the committees were designated, "[Y]ou have to abide by the law," and Elashi - though determined to speak out publicly against any such designation - responded, "Well, I'm gonna abide by the law because I won't be able

---

[9]The Treasury Department indisputedly has the authority and the ability to designate Zakat Committees as SDTs. In August 2007, for example, Treasury designated the al-Salah Society - a Gaza Zakat Committee - as an SDT based on its relationship with Hamas. DX 1052; 7R. 7342. Treasury also separately designated a number of Hamas leaders. 7R. 7342-43.

to make a transfer. I know that." 7R. 7504-05. Even after this conversation, which FBI language specialists reviewed around the time it occurred, the government did not designate the Zakat Committees as SDTs or FTOs.[10]

Reports appeared occasionally in the media that the government was investigating HLF for supporting Hamas. 7R. 8498. In late 1997, HLF retained lawyer (and former Congressman) John W. Bryant to address the reports with the government. 7R. 8497. In 1998 and 1999, Bryant met with officials from the State Department, the FBI (on three occasions), and the Israeli Embassy. In each instance, he asked if HLF should do anything differently. No one cautioned him that HLF should not deal with the Zakat Committees. 7R. 8498-8505.[11]

These facts establish that the HLF defendants were attempting to comply with the law and that the government deliberately misled them into thinking they were doing so. This demonstrates no offense would have been committed but for the government's conduct.

**h.    Mistake of Law**

Defense counsel were ineffective for not pursuing a mistake of law defense. This was a legitimate defense based on the meeting with the officials where the defendants were led to believe that contributions to the Zakat Committees were not prohibited.

In *United States v. Davis*, 690 F.3d 330 (5th Cir. 2012), the court stated:

"In general, under both federal and Texas state law, ignorance of the law is not a defense. *See*, *e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); Tex. Penal Code Ann. 8.03(a) ("It is no defense to prosecution

---

[10]Baker and Elashi were not alone in believing that the Treasury Department had to designate a Zakat Committee before contributions to it would be unlawful. Referring to Treasury's designation of the al-Salah Society in August 2007, prosecution expert Matthew Levitt wrote: "The new U. S. designation criminalizes American donations to al-Salah and officially informs banks and donors of the organization's ties to and activities on behalf of Hamas." 4R. 4062; DX 1054. According to the government's trial theory, by contrast, donations to al-Salah had been "criminalized" since 1995, when Hamas was first designated, even though al-Salah had not been separately designated.

[11]Bryant sought, and was denied, meetings with Department of Justice officials (including Attorney General Reno) and with Secretary of State Madeleine Albright. 7R. 8505.

that the actor was ignorant of the provisions of any law after the law has taken effect."). Under federal law, a mistake-of-law defense may be allowed only where the crime charged is a specific intent crime. *Cf. United States v. Whaley*, 577 F.3d 254, 262 n. 6 (5th Cir. 2009); *see also United States v. Schultz*, 333 F.3d 393, 410-11 (2d Cir. 2003)."

The offense charged in the indictment in the case at bar were specific intent crimes. For this reason, the defendants received ineffective assistance based on the failure to raise this defense.

i.    **Vagueness of Statutes**

18 U.S.C. §2339B and 50 U.S.C. 1701-1706 prohibits giving aid to designated terrorist organizations. However, in this case, the Zakat Committees that received the aid were not designated. This raises an issue of constitutional vagueness as applied.

The Fourteenth Amendment ensures that the individual need not "speculate as to the meaning of penal statutes" and is "entitled to be informed as to what the State commands or forbids," *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). The void-for-vagueness doctrine requires that "laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them,'" *Betancourt v. Bloomberg*, 448 F.3d 547, 552 (2d Cir. 2006) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

Vagueness may invalidate a criminal law for either of two independent reasons. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement. *See id.*, *Kolender v. Lawson*, 461 U.S., at 357; *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974) ("The doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement

officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'"). This second ground mandates that laws contain "minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Indeed, statutes must "provide explicit standards for those who apply" them to avoid "resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09, 92 S.Ct. 2294.

Accordingly, the first issue is whether the statutory scheme prohibiting material support to a designated terrorist organization "provides fair notice to the citizen." *See Morales*, 527 U.S. at 56. "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits. . . . " *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). Accordingly, "[w]hat renders a statute 'vague' is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved, but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285 (2008).

The vagueness that dooms this statute is not the product of uncertainty about the normal meaning of designated, but rather about what activity is covered by the statute when the organization is not designated. The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law. Here, the defendants made significant efforts to comply with the law. Yet, according to the government, their conduct did not comply. If they were not in compliance, it is only because of the uncertainty and vagueness inherent in the application of these statutes to their conduct.

## GROUND TWO

All defendants received ineffective assistance of counsel on appeal.

## ARGUMENT AND AUTHORITIES

For the reasons set out below, all of the defendants received ineffective assistance of counsel on appeal.

## Legal Standards for Ineffective Assistance of Counsel on Appeal

It is well established that a defendant is entitled to the effective assistance of counsel as required by the Sixth and Fourteenth Amendments. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Effective assistance is denied if, "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984).

Due Process requires that a defendant have effective assistance of counsel on his appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). Effectiveness of appellate counsel is judged by the *Strickland* test. *Teague v. Scott*, 60 F.3d 1167, 1174 (5th Cir. 1995). Under the *Strickland* test, it is not necessary to show the outcome of the appeal would be different. Rather, it must be shown that the Petitioner received a fair appeal the result of which is worthy of confidence.

Although appellate counsel is not required to raise every non-frivolous claim and may be selective in inclusion of issues in order to maximize success, counsel has an obligation to raise determinative issues. *See Smith v. Robbins*, 528 U.S. 259 (2000). In this regard, several circuits have held that appellate counsel is ineffective if counsel fails to raise a claim that qualifies as a "dead bang" winner. *See Upchurch v. Bruce*, 333 F.3d 1158 (10th Cir. 2003); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003); *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991). *See also, Strickland,* 466 U.S. at 694; *Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir. 1985); *Lockhart v.*

*Fretwell,* 506 U.S. 364 (1993); *Strickland,* 466 U.S. at 687; *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *Kyles v. Whitley,* 514 U.S. 419 (1995).

Where a Petitioner alleges ineffective assistance of appellate counsel, the appellate court first examines the record to see whether counsel omitted significant and obvious issues and, if so, the court then compares the neglected issues to those actually raised. *Stallings v. United States*, 536 F.3d 624 (7th Cir. 2008). If the ignored issues are clearly stronger than those raised, appellate counsel was deficient. *See also Passmore v. Estelle*, 594 F.2d 115 (5th Cir. 1979) (finding appellate counsel ineffective).

In *Showers v. Beard*, 635 F.3d 625, 634 (3rd Cir. 2011), the court granted habeas relief where a court unreasonably determined there was not a *reasonable probability* that the outcome would have been different but for the ineffective assistance of appellate counsel. The *Showers* court discussed the issue that should have been raised on appeal and noted that the omitted issue was "clearly stronger than those presented." *Id*. The court then found prejudice established without a finding that Showers would definitely have won the appeal had the issue been raised. *Id*.

Also notable is the Seventh Circuit's recent opinion in *Shaw v. Wilson*, 721 F.3d 908 (7th Cir. 2013). In that case, the court concluded that the state prisoner's appellate counsel had been ineffective – "with full cognizance of the high bar" faced by a defendant raising such a claim in federal court – in failing to raise an "obvious," "nonfrivolous claim" that was "clearly stronger than the claim actually presented." *Id*. at 916.

Ineffective assistance on appeal is established based on the following:

a.    **Failure to Challenge Sufficiency of Evidence on Appeal**

**Legal Standard on Sufficiency of Evidence**

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358 (1970). A conviction totally devoid of evidentiary support violates due process. *Gregory v. City of Chicago*, 394 U.S. 111 (1969).

In the case at bar, all defendants timely moved for judgment of acquittal. The standard of review, therefore, requires the court to view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *United States v. Grossman*, 117 F.3d 255 (5th Cir. 1997) (defendants convictions not supported by evidence); *United States v. Schuchmann*, 84 F.3d 752 (5th Cir. 1996) (government failed to prove allegations of indictment). In reviewing the sufficiency of the evidence, all of the evidence is to be considered. *See Jackson*, *supra*; *United States v. Wright*, 24 F.3d 732 (5th Cir. 1994) (court considers countervailing evidence in concluding that evidence is insufficient).

**Direction and Control**

In order to be guilty of any count in the indictment, the government was required to prove that Hamas directed or controlled the Zakat Committees listed in the indictment. The jury instructions stated:

**COUNT 1**
"Each of the defendants is charged in Count 1 with the crime of conspiracy to provide material support and resources to a Designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B(a)(1). In pertinent part, Count 1 reads as follows:

Beginning from on or about October 8, 1997, and continuing until the date of the Indictment, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants Holy Land Foundation for Relief and Development (HLF), Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Mufid Abdulqader and Abdulrahman Odeh, and others known and unknown to the Grand Jury, knowingly conspired to provide material support and resources, as those terms are defined in Title 18, United States Code, Section 2339A(b), to wit, currency and monetary instruments, to HAMAS, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B(a)(1).

Title 18, United States Code, Section 2339B, provides, in relevant part, 'Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so' is guilty of a crime.
. . .

The second element requires you to find that when a defendant joined the conspiracy to provide material support or resources to a designated terrorist organization, he did so 'knowingly.' To do so, you must find beyond a reasonable doubt that (1) the defendant under consideration agreed to provide material support or resources to Hamas, and (2) the defendant under consideration either knew that Hamas was designated by the United States government as a foreign terrorist organization, or he knew the organization has engaged in or engages in terrorist activity.
. . .

## COUNTS 2 THROUGH 10
The defendants HLF, Shukri Abu Baker, and Ghassan Elashi are charged in these counts with violating Title 18, United States Code, Section 2339B. That statute provides, in relevant part, 'Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so' is guilty of a crime. To satisfy the requirement that the provision of material support or resources be made knowingly, 'a person must have knowledge that the organization is a designated terrorist organization . . . or that the organization has engaged or engages in terrorism.'

While Count 1 charged each defendant with conspiring, *i.e.,* agreeing, to provide material support or resources to a foreign terrorist organization - namely, Hamas - Counts 2 through 10 charge defendants HLF, Shukri Abu Baker, and Ghassan Elashi with actually doing so. In other words, these counts of the Indictment charge the substantive crimes which the defendants are charged in Count 1 to have conspired, or agreed, to commit.

Counts 2 through 10 of the Indictment read, in relevant part, as follows:

On or about the dates set forth below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants HLF, Shukri Abu Baker, and Ghassan Elashi, aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly provide and attempts to provide material support and resources, as those terms are defined in Title 18, United States Code, Section 2339A(b), to wit, currency and monetary instruments, to HAMAS, a designated Foreign Terrorist Organization, by issuing and causing to be issued wire transfers in the amounts indicated, from the defendant HLF bank accounts in the Northern District of Texas, to the following organizations, which operated on behalf of, or under the control of, HAMAS:

. . .

To find HLF, Shukri Abu Baker, and Ghassan Elashi guilty of the crimes charged in Counts 2 through 10, you must find that the government has proven each of the following elements beyond a reasonable doubt:

First:  That the defendant under consideration knowingly provided, or attempted to provide, the material support alleged in the count under consideration to Hamas through the entity listed in that count;

. . .

You may find that a defendant under consideration provided material support to Hamas if you find (1) that the entity to which the defendant provided the support was operating under Hamas's direction or control or if it was organizing, managing, supervising, or otherwise directing the operation of Hamas's personnel or resources and (2) that the defendant under consideration knew that the entity to which the defendant made the contribution was operating under Hamas's direction or control or that it was organizing, managing, supervising, or otherwise directing the operation of Hamas's personnel or resources.

. . .

## COUNT 11

The defendants HLF, Shukri Abu Baker, Ghassan Elashi, Mufid Abdulqader and Abdulrahman Odeh are charged in Count 11 with the offense of conspiracy to provide funds, goods and services to a Specially Designated Terrorist, in violation of Title 50, United States Code, Sections 1701 through 1706.  In pertinent part, Count 11 reads as follows:

Beginning from on or about January 25, 1995, and continuing until the date of the Indictment, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants HLF, Shukri Abu Baker, Ghassan Elashi, Mufid Abdulqader, Abdulrahman Odeh, and others known and unknown to the Grand Jury, knowingly and

willfully conspired, confederated and agreed to violate Executive Order 12947, by contributing funds, goods and services to, and for the benefit of, a Specially Designated Terrorist, namely HAMAS.

. . .

Section 595.204 of Title 31 of the Code of Federal Regulations provides, 'except as other authorized, no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contributions of funds, goods, or services to or for the benefit of a specially designated terrorist.'

. . .

Section 595.408 of Title 31 Code of Federal Regulations provides,

(a)    Unless otherwise specifically authorized by the Office of Foreign Assets Control by or pursuant to this part, no charitable contribution or donation of funds, goods, services, or technology to relieve human suffering, such as food, clothing or medicine, may be made to or for the benefit of a specially designated terrorist.  For purposes of this part, a contribution or donation is made to or for the benefit of a specially designated terrorist if made to or in the name of a specially designated terrorist; if made to or in the name of an entity or individual acting for or on behalf of, or owned or controlled by, a specially designated terrorist; or if made in an attempt to violate, to evade or to avoid the bar on the provision of contributions or donations to specially designated terrorists.

. . .

You may find that two or more people agreed to violate Executive Order 12947 if you find that two or more individuals agreed to contribute funds, goods or services to or for the benefit of Hamas in violation of that order.

. . .

## COUNTS 12 THROUGH 21

The defendants HLF, Shukri Abu Baker, and Ghassan Elashi are charged in Counts 12 through 21 with the crime of providing funds, goods and services to a Specially Designated Terrorist, in violation of Title 50, United States Code, Sections 1701 through 1706.  While Count 11 charges each defendant with conspiring, *i.e.*, agreeing, to provide funds, goods and services to a Specially Designated Terrorist - namely, Hamas - Counts 12 through 21 charge these three defendants with actually

doing so.  In other words, these counts of the Indictment charge the substantive crimes which the defendants are charged in Count 11 to have conspired, or agreed, to commit.

In pertinent part, Counts 12 through 21 read as follows:

On or about the dates listed below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants HLF, Shukri Abu Baker, and Ghassan Elashi, aided and abetted by each other and others known and unknown to the Grand Jury, willfully contributed funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, by issuing and causing to be issued wire transfers in the amounts indicated, from the HLF bank accounts in the Northern District of Texas, to the following organizations, which operated on behalf of, or under the control of, HAMAS:

. . .

Section 595.204 of Title 31 Code of Federal Regulations provides, 'except as otherwise authorized, no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.'

. . .

Section 595.408 of Title 31 Code of Federal Regulations provides,

(a)    Unless otherwise specifically authorized by the Office of Foreign Assets Control by or pursuant to this part, no charitable contribution or donation of funds, goods, services, or technology to relieve human suffering, such as food, clothing or medicine, may be made to or for the benefit of a specially designated terrorist.  For purposes of this part, a contribution or donation is made to or for the benefit of a specially designated terrorist if made to or in the name of a specially designated terrorist; if made to or in the name of an entity or individual acting for or on behalf of, or owned or controlled by, a specially designated terrorist; or if made in an attempt to violate, to evade or to avoid the bar on the provision of contributions or donations to specially designated terrorist.

Section 595.701(a) provides that whoever willfully violates any license, order, or regulation issued under the Act is guilty of a crime.

To find a defendant guilty of the crimes charged in Counts 12 through 21, you must find that the government has proven each of the following elements beyond a reasonable doubt:

> First:  That the defendant under consideration himself, or by aiding and abetting another defendant or by being aided or abetted by another defendant, contributed or attempted to contribute funds, goods, or services to or for the benefit of Hamas, a Specially Designated Terrorist, by providing the support listed in the count under consideration to the entity identified in that count; and

> Second:    That the defendant under consideration willfully contributed, or attempted to contribute, the support listed in the count under consideration to the entity identified in that count or that the defendant in question was an officer, direction, or agent of the Holy Land Foundation and knowingly participated in that corporation's willful contribution or attempted contribution of the support listed in the count under consideration to the entity identified in that count.

. . .

> I instruct you that Hamas has been a Specially Designated Terrorist since January 23, 1995.  Accordingly, you may find that a defendant under consideration contributed funds, goods, or services to or for the benefit of a Specially Designated Terrorist if you find (1) that the entity to which that defendant made the contribution was operating under Hamas's direction or control or if it was organizing, managing, supervising, or otherwise directing the operation of Hamas's personnel or resources and (b) that the defendant under consideration knew that the entity to which the defendant made the contribution was operating under Hamas's direction or control or if it was organizing, managing, supervising, or otherwise directing the operation of Hamas's personnel or resources."

No funds were sent by the Holy Land Foundation to Hamas.  Rather, the government contended that by sending funds to the listed Zakat Committees, the defendants were sending funds to Hamas.  The government's claim was that Hamas controlled the Zakat Committees.

The Fifth Circuit Court of Appeals recognized that the primary issue in the trial was whether Hamas controlled the Zakat Committees.  *United States v. El-Mezain*, et al, 664 F.3d 467 (5th Cir. 2011).  The Court stated:

"The key issues addressed by the evidence were the connection between the defendants and Hamas, and Hamas's control of the Zakat Committees."

664 F.3d at 488.

Although the question of Hamas's control of the Zakat Committees was the key issue in the trial, there was, in fact, very little evidence actually addressing the issue. This is because neither side called any witnesses who were on the Zakat Committees, worked at the Committees or had any personal business transactions with the Committees. Thus, there was no evidence at all as to how the Zakat Committees operated, how decisions were made, how they received and distributed aid or who actually controlled or directed the activities of the Committees.

Viewing the evidence in the most charitable fashion possible to the government shows the following. The government presented evidence that some of the defendants in this case were sympathetic with some of the activities and philosophy of Hamas and that some of the defendants had connections to Hamas leaders. The government also presented evidence that some Hamas members and sympathizers were on the Zakat Committees. The government additionally offered conclusory statements from some witnesses claiming that Hamas "controlled" the Zakat Committees. However, these statements were not supported by evidence of actual control or any explanation of what the witness meant by control.

In fact, as shown below, conclusory statements of an alleged fact, not supported by evidence supporting the fact, are not sufficient to prove the fact. Additionally, the term "control" has a clear meaning in a variety of legal contexts and the government witnesses who claim Hamas controlled the Zakat Committees were not using the word "control" in its legal sense.

The government's unsuccessful attempts to meet their burden to prove Hamas's control of the Zakat Committees came from three primary witnesses. First, government expert witness

Matthew Leavitt testified generally about Hamas and Zakat Committees. He then gave the following testimony in response to government questions:

> "Q.    Are there Zakat Committees that are controlled by Hamas?
> A.    There are.  (Vol. 7, p. 96)
>
> Q.    Does Hamas control every Zakat Committee in the West Bank and Gaza?
> A.    No.
> Q.    Do they control a majority of them?
> A.    They control many.  (vol. 7, p. 102).
> A.    If the leadership of the committee is dominated by Hamas members, that suggest the leaning of the committee.  If not that the committee itself is Hamas, that there are Hamas people in a position of authority able to channel that committees activities toward their group.
> Q.    Have you ever visited a Zakat Committee?
> A.    I have never felt the need.  (Vol. 7, p. 104)
> Q.    Were the names of any members of the board of any of those Zakat committees that I have named to you, did the name of any of the board members of those Zakat Committees appear on the Treasury list as of June 14th, 2001?
> A.    Not to my knowledge, though, as you said, it is a very big list, but I don't think so.
> Q.    And today?
> A.    Same."  (Vol. 7, p.131).

Even in the light most favorable to the government, Leavitt's testimony failed to provide any information concerning how the committees operated and how decisions were made.  His testimony did not explain what he meant by saying Hamas "controlled" some Zakat Committees.  However, it is obvious that he has no factual basis to provide any testimony concerning control in the legal and practical sense and was only referring to some generalized sympathy among some people on the committees with Hamas.

The second attempt to address this issue came with government witness Mohamed Shorbagi. He was familiar with various Muslim groups in America including the Holy Land Foundation and grew up in Gaza.  He has never been to the West Bank.  (Vol. 7, p. 133).  Shorbagi testified as follows:

"Q.    Who controlled the Zakat Committees that the Holy Land Foundation was sending these either food packages or money to being food packages, who controlled those Zakat Committees in the West Bank?

A.    There are a number of Zakat Committees in the West Bank.  Some of them are controlled by Hamas, others run by different people, not necessarily Hamas.

. . .

Q.    Which committees did you know or understand to be controlled by Hamas or Hamas Committees?

A.    Zakat Charity - I am sorry.  Nablus Zakat Charity, Jenin, Remallah, Hebron.  That is the ones that I know."  (Vol. 20, pp. 71-72).

. . .

Q.    (BY MR. JACKS)  And I may not have made this clear, but I wanted to ask you, you said that before Hamas was designated and then after Hamas was designated, the Holy Land Foundation gave to the same organizations.  Is that correct?

A.    Correct.

Q.    And who was - who benefitted or who controlled or who were those organizations affiliated with?

A.    They were founded and controlled by Hamas."  (Vol. 20, p. 122).

The fact that Shorbagi's testimony failed to prove the control element is best illustrated by the fact that the Fifth Circuit found that it was inadmissible hearsay.  The Fifth Circuit opinion stated:

## "1.  Mohamed Shorbagi

Mohamed Shorbagi was a representative of HLF in Georgia who helped raise funds for the organization.  He pleaded guilty in s separate case to providing material support to Hamas through HLF, and he testified in the instant case as part of a plea agreement.  Shorbagi testified that Hamas controlled several zakat committees in the West Bank and Gaza to which HLF donated money.  He also identified several people associated with the committees as Hamas leaders, and he stated that HLF was a part of Hamas.  The defendants challenge this testimony as improper hearsay, contending that Shorbagi merely repeated what he had read in newspapers and what he had learned from friends.  At one point during his testimony, the Government asked Shorbagi the basis for his knowledge, and he responded:  'It came from newspapers, it came from leaflets, it came from Hamas - the internet later on in '98, '99, the website of Hamas, and from also talking 'among friends.'  The defendants based their argument on appeal in large part on this exchange.

. . .

Shorbagi expressly testified that Hamas controlled the zakat committees in Nablus, Jenin, Ramallah, and Hebron, all of which were charged in the indictment as receiving funds from HLF.  Shorbagi may very well have personally known that these

committees were controlled by Hamas form his activity in raising money for HLF, from attending conferences with the individual defendants, and from meeting various Hamas leaders at the conferences. However, when asked the crucial question as to the basis for this specific knowledge, Shorbagi gave as examples 'newspapers,' 'leaflets,' the 'internet,' and 'friends.' These sources constitute classic hearsay rather than personal knowledge. *See*, *e.g. Roberts*, 397 F.3d at 295 (newspapers are hearsay); *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (web postings from the Internet were inadmissible hearsay). In an effort to rehabilitate Shorbagi's answer, the Government asked if the 'friends' to which Shorbagi referred were persons who were involved with him in supporting Hamas and organizations like HLF. But Shorbagi's affirmative response did not transform his apparent reliance on the statements of others, whether they were similarly situated to him or not, into personal knowledge. We therefore conclude that Shorbagi's testimony that Hamas controlled the zakat committees was hearsay, and it was error for the district court to allow it."

664 F.3d at 494-496.

Shorbagi's testimony was inadmissible because he had no personal, non-hearsay factual basis for it. More importantly, and not addressed by the Fifth Circuit's opinion, is that he gave no testimony at all laying out factual basis for concluding that Hamas controlled any Zakat Committees. He had no information or knowledge as to how the committees operated or how decisions were made.

Also, it should be noted that Shorbagi's dishonesty and desire to say whatever he thought would please the government, was demonstrated by his testimony that the Zakat Committees "were founded and controlled by Hamas." (Vol. 26, p. 122). It is clear from the evidence that Hamas did not fund the Zakat Committees. They were in existence long before Hamas was created. Even the government does not contend that Hamas created these committees. Government witness Avi stated in regards to the Zakat Committees that they were "not part of Hamas at the time of the formation" and that the committees were established in the 70's and 80's. (Vol. 25, p. 227). However, in an attempt to please the government, Shorbagi displayed his shamelessness by claiming that Hamas created the committees.

The government's third attempt to establish control of the committees by Hamas came with the anonymous Israeli witness Avi.  It was claimed that Avi was an expert on Hamas financing through his work with the Israeli Security Agency.  His testimony was essentially that there were known Hamas members who were on the Zakat Committees, sometimes in leadership positions, and that this proved that Hamas controlled the committees.  Like all of the other government witnesses, Avi had never been to a Zakat Committee and had no information or knowledge as to how the committees operated.  Avi created a self serving list of criteria, and based on his list concluded that Hamas controlled these committees.  However, even accepting Avi's application of his self created criteria does not provide proof of control of the committees by Hamas.

For instance, Avi identified members of Hamas who he said were on the Zakat Committees. However, he also said that not all members of the committees were Hamas members.  The testimony was,

> "Q.    And does it matter to you if there is a member of the committee who is not Hamas?  Is that important for you to consider?
> A.    If a member of the committee - It could be.  It could be that a member or even members of other are non-Hamas, they can be members of the committee, but it doesn't change my mind."  (Vol. 28, p. 8).

Avi also actually admitted that there were non-Hamas members of the committees.  (Vol. 27, p. 195).  On one of the committees there was a report that said only five out of 16 committee members were Hamas activists.  (Vol. 28, pp. 166-167).

Additionally, Avi acknowledged that he has never been to a Zakat Committee and never spoken to anyone who received money from a Zakat Committee.  (Vol. 28, p. 91).  In fact, he has never spoken to any Palestinians about Zakat Committees.  (Vol. 28, p. 96).  Avi also admitted that the committees were always under the control and jurisdiction of either Jordan, Israel or the Palestinian authority all of whom are enemies of Hamas.  (Vol. 28, pp. 131-138).

Avi admitted that most of the aid from these Zakat Committees did not go to what he called special segment persons, such as families of suicide bombers or Hamas activists killed by the Israelis. He said,

"They are focusing on this. And it is not high percentage. Okay?" (Vol. 28, p. 180).

Ultimately, the government relies on Avi's affirmative response to the following question concerning each of the listed committees:

"Q.    I am just asking you about whether each of these was controlled by Hamas or part of the Hamas social wing?" (Vol. 28, p. 47).

A close examination of Avi's testimony shows that he had no knowledge or information as to how the committees operated and based his claim of control on his conclusion that there were Hamas activists in positions on the committees. His testimony did no more than the other witnesses to address the question of control from a legal or practical standpoint.[12]

An examination of the evidence, with a proper application of the law, will show that Hamas did not control these committees any more than the fact that a person is a member of the Republican party, and is an officer of Walmart, means that the Republican party controlled Walmart. The evidence simply shows that Zakat Committees were composed of community leaders, some of whom were Hamas sympathizers and some of whom were not. There is no evidence that the Hamas sympathizers or members worked in the committees on behalf of Hamas, any more than there is evidence that a Fatah activist on the committee worked on the committee on behalf of Fatah. Just as Americans can wear different hats, and perform different roles in different aspects of their lives, so too can Palestinians. A person can be a doctor or lawyer by profession, a member of Hamas or

---

[12]It does not appear that the government relied on any other witnesses in an attempt to prove control of the Zakat Committees by Hamas. However, to the extent that there was even a slight suggestion by any other witnesses that Hamas controlled the committees, the other witnesses had even less knowledge than these three witnesses.

a Republican by political belief, and a board member of the Red Cross or a Zakat Committee. This person can do his professional and charitable work separate from his political activity in Palestine as well as in America. In other words, the fact that a person may be a Hamas activist, and sits on a Zakat Committee, in no ways proves that the committee was controlled by Hamas.

The question of whether the government proved that Hamas controlled these committees involves two sub-questions. First, what is actually meant by the term "control" and second, what is the legal effect of government witnesses claiming, in a conclusory fashion, that Hamas "controls" a Zakat Committee without providing any factual basis to support their conclusions.

### **Meaning of Control or Direct**

The jury instruction used the terms direction or control, although the government's testimony focused on control. However, under the meaning of either term the government evidence falls short.

The following are the pertinent definitions of these terms:

**CONTROL**
Black's Law Dictionary (9th ed. 2009).
**control**, *n.* (16c) The direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee <the principal exercised control over the agent>.

**Control**, Merriam-Webster Dictionary
**con•trol**
: to direct the behavior of (a person or animal): to cause (a person or animal) to do what you want
: to have power over (something)
: to direct the actions or function of (something); to cause (something) to act or function in a certain way

**control**
: the power to make decisions about how something is managed or done
: the ability to direct the actions of someone or something
: an action, method, or law that limits the amount or growth of something

**DIRECT**
Black's Law Dictionary (9th Ed. 2009)
**direct**, *vb* (14c) 1.  To aim (something or someone).  2. To cause (something or someone) to move on a particular course.  3. to guide (something or someone); to govern.  4. To instruct (someone) with authority.  5. To address (something or someone).

**Direct**, Merriam-Webster Dictionary
**di•rect**
2 a:  to regulate the activities or course of
   b:  to carry out the organizing, energizing, and supervising of *<direct* a project>
   c: to dominate and determine the course of
   d: to train and lead performances of *<direct* a movie>

Cases in a variety of legal disciplines confirm that these common sense definitions of direct and control apply to legal cases.

For instance, in *Linn v. United States*, 281 Fed.Appx. 339 (5th Cir. 2008) (not designated for publication), the court found that the government did not retain substantial control over the performance of a contract at an Air Force Based where the means and methods of implementing the contract was left to the discretion of the contractor.

In *Commodity Futures Trading Commission v. International Financial Services, Inc.*, 323 F.Supp.2d 482 (S.D.N.Y. 2004), the court stated that to establish that a defendant controlled a corporation for purpose of the Community Exchange Act it must be shown that the defendant exercised general control over the operation of the entity and possessed power or ability to control specific transactions or activities.  *See also*, *Monieson v. Commodity Futures Trading Commission*, 996 F.2d 852 (7th Cir. 1993) (finding company chairman to be controlling person when he made management and hiring decisions).  *See also*, *United States v. Sung Bum Chang*, 237 Fed.Appx. 985 (5th Cir. 2007) (not designated for publication) (Chang controlled the activities at Club Wa and directed his wife and club employees in the criminal activities related to Club Wa); *In re Associated Bicycle Services, Inc.*, 128 B.R. 436 (Bank. N.D. Ind. 1990) (identifying the twenty common law

factors or elements that have been identified as indicating whether sufficient control is present to establish an employer-employee relationship. These include such things as hiring, supervising, setting hours or work, furnishing tools or equipment for the work, right to discharge or terminate).

Under the definition of control and direction in these cases, as well as that found in Black's Law Dictionary and the Merriam-Webster Dictionary, the evidence in the case at bar did not come close to establishing that Hamas exercised direction or control over the Zakat Committees. The government presented no evidence from any witness that had any knowledge of how the committees were managed or how decisions were made. Not a single witness provided any information that the Hamas organization controlled or directed the activities of these committees.

**Significance of Witnesses Conclusory Claims That Hamas**
**Controlled Zakat Committees**

The Court must also consider whether the conclusory statement that Hamas "controlled" the Zakat Committees is sufficient evidence to prove that element of the offense. As explained in the cases below, a conclusory statement is not evidence, and without an evidentiary basis to support the conclusion, there is a failure of proof. The pertinent cases are:

*United States v. Jones*, 614 F.2d 80 (5th Cir. 1980) - Petitioner's conclusory statement that Government engaged in conspiracy to violate his constitutional rights was insufficient to state constitutional claim in habeas corpus. Petitioner's claim in habeas corpus that Government illegally searched his residence was wholly conclusory and unsupported by factual allegations or proof.

*Ben Shou Zhu v. U. S. Dept. of Justice*, 246 Fed.Appx. 66 (2nd Cir. 2007) (not designated for publication) - Immigration judge's adverse credibility determination on asylum applicant's claim was conclusory and not supported by substantial evidence.

*United States v. Stine*, 458 F.Supp. 366 (E.D. Pa. 1978) - Search warrant affidavit containing the conclusory statement that purchase of a rifle by the wife of the defendant, a felon, was "straw" and was insufficient to support a finding of probable cause for search.

*United States v. Smith*, 13 F.3d 380 (10th Cir. 1993) - There was insufficient evidence to prove that park was "playground" to support finding that defendant distributed crack cocaine within 1,000 feet of playground, where there was absolutely no evidence in record that playground apparatus existed in the park. Undercover officers conclusory statement that park had playgrounds was not enough.

*United States v. Rodriguez-Hernandez*, 197 Fed.Appx. 657 (9th Cir. 2006) (superseding opinion, 2007 WL 135686) (not designated for publication) - Conclusory declaration of defendant charged with illegal re-entry that he did not understand his right to be appointed an attorney before giving a confession, was insufficient to create a contested issue so as to require an evidentiary hearing on his motion to suppress.

*United States v. Reece*, 547 F.2d 432 (8th Cir. 1977) - Where prosecution rested its proof of the mailing of various checks on conclusory statements by witnesses that they expected to receive a check in the mail, there was a complete failure of proof that checks had been mailed.

*United States v. Gilmer*, 793 F.Supp. 1545 (D. Colo. 1992) - Government failed to establish that officer fully advised defendant of his Miranda rights despite conclusory statements that defendant was Mirandized.

*Cox v. Barnhart*, 345 F.3d 606 (8th Cir. 2003) - Conclusory statements by physician, if unsupported by medical records, do not bind the ALJ in his determination as to whether claimant for social security disability insurance is disabled.

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) - Supreme Court emphasized that, when assessing the sufficiency of a civil complaint, a court must distinguish factual contention and "threadbare recitals of a cause of action supported by mere conclusory statements."

*Metz v. Shalala*, 49 F.3d 374 (8th Cir. 1995) - Physician's conclusory letter diagnosing claimant as disabled without supporting evidence does not amount to substantial evidence of disability.

*Price v. City of Charlotte*, 93 F.3d 124 (4th Cir. 1996) - Neither conclusory statements that plaintiff suffered emotional distress nor mere fact that constitutional violation occurred supports award of compensatory damages.

*Harvey v. Mark*, 352 F.Supp. 285 (D. Conn. 2005) - Plaintiff's conclusory statements expressing his belief that the defendants treated men differently than women were insufficient proof..

*Lucas v. Chicago Transmit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) - Conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment.

As these cases demonstrate, a conclusory statement is something different and distinguishable from evidence. The Court's analysis as to whether the government proved that Hamas controlled the Zakat Committees cannot begin and end with the conclusory claims that there was control. The Court must look beyond these conclusory statements to determine if there was any evidence supporting the conclusion. A review of the record will show that there was no evidence supporting the claim that Hamas controlled the Zakat Committees.

**Conclusion on Sufficiency of Evidence**

The evidence was legally insufficient to prove that Hamas controlled the Zakat Committees. Defense counsel on appeal was ineffective in not raising this very meritorious issue on appeal.

**b.**    <u>**Vagueness of Statutes**</u>

18 U.S.C. §2339B and 50 U.S.C. 1701-1706 prohibits giving aid to designated terrorist organizations.  However, in this case, the Zakat Committees that received the aid were not designated. This raises an issue of constitutional vagueness as applied.  For all of the reasons argued under the previous ground for not raising this issue at trial, there is also ineffective assistance of counsel for not raising the issue on appeal.

**c.**    <u>**Failure to Raise the Court of Appeals Erroneous Harm Analysis on Petition for Writ of Certiorari**</u>

Defense counsel also rendered ineffective assistance of counsel on appeal by not raising, in their Petition for Writ of Certiorari to the Supreme Court, the erroneous harm analysis by the Fifth Circuit on the four evidentiary errors, identified by the Court of Appeals.  As the defense argued in their Petition for Rehearing En Banc in the Fifth Circuit, the Court engaged in a clearly erroneous harm analysis in several ways.  Among these erroneous approaches were that the Court viewed the evidence in the light most favorable to the government in the harm analysis, which is clearly improper.  Also, the Court ignored the fact that the four items of evidence that were erroneously admitted into evidence were all not in evidence in the first trial.  The first trial ended with some acquittals and a hung jury on the rest of the counts.  The fact that these four items of evidence were not part of the first trial provides the Court of Appeals the necessary facts to make a legitimate, actual harm analysis.  Yet, the Court declined to consider this.  A full explanation of the erroneous harm analysis is in the Petition for Rehearing En Banc filed in the Fifth Circuit.

These facts raised an issue that would have had a reasonably good chance of being accepted by the Supreme Court.  The defense abandoned this very good argument and thus rendered ineffective assistance by not raising it on the Petition for Writ of Certiorari.

## GROUND THREE

There is no evidence that Hamas controlled the Zakat Committees.  Thus, the defendants are actually innocent.

## ARGUMENT AND AUTHORITIES

All of the defendants are innocent of all of the charges.  This is a fact based both on the evidence presented at trial and the new evidence presented with this 2255 motion.

### Actual Innocence

The Fifth Circuit has yet to recognize free-standing claims of actual innocence.  *See In re Swearingen*, 556 F.3d 344 (5th Cir. 2009).  However, since the defendants are innocent, this case presents a prime opportunity to reassess that holding.

**a.    Introduction:  *Herrera* and *Schlup* Claims**

Assertions of actual innocence are categorized either as *Herrera*-type claims or *Schlup*-type claims.  *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  A *Herrera*-type claim involves a substantive claim in which the applicant asserts a bare claim of innocence based solely on newly discovered evidence.  *Schlup,* 513 U.S. at 314, 115 S.Ct. 851.  A *Schlup*-type claim, on the other hand, is a procedural claim in which the applicant's claim of innocence does not alone provide a basis for relief but is tied to a showing of constitutional error at trial.  *Schlup,* 513 U.S. at 314, 115 S.Ct. 851.

The *Herrera* decision serves as sound precedent for recognition of habeas relief when an actual innocence claim alone is raised.  In *Herrera*, six members of the Court suggested execution of the innocent was antithetical to our constitutional system.  Justice O'Connor, joined by Justice Kennedy, stated that "the execution of a legally and factually innocent person would be a constitutionally intolerable event."  506 U.S. at 420.  Justice O'Connor then concluded that the

existence of federal relief for such a person need not be addressed in the case before the Court. *Id.* Justice White stated that "a persuasive showing of actual innocence made after trial . . . would render unconstitutional the execution of the petitioner in this case." *Id.* at 429. He also declined to finally decide the issue on the record before the Court. Justice Blackmun, joined in dissent by Justices Souter and Stevens, stated that executing an innocent person is the "ultimate arbitrary imposition" and unquestionably violates both the Eighth and Fourteenth Amendments.[13] *Id.* at 437.

This principle is essential in a constitutional system. "After all, the central purpose of any system of criminal justice is to convict the guilty and free the innocent." *Herrera*, 506 U.S. at 399. *See United States v. Nobles*, 422 U.S. 225, 230, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Further, in this context, no legally cognizable distinction exists between a prisoner sentenced to death and one sentenced to a term of imprisonment. "It would be a rather strange jurisprudence . . . which held that under our Constitution [the actually innocent] could not be executed, but that he could spend the rest of his life in prison." *Herrera*, 506 U.S. at 405.

Conceptually, relief for the actually innocent arises under the Due Process Clause of the Fifth and Fourteenth Amendment. In fact, both procedural and substantive due process demand habeas relief under these circumstances.

**b.      Due Process, Generally**

The Due Process Clause of the Fifth Amendment provides that "No person shall ... be deprived of life, liberty, or property, without due process of law." The Due Process Clause of the Fourteenth Amendment states the same as to the action of a State. The Clause protects individuals against two types of government action. "Substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct.

---

[13]Justices Scalia and Thomas, concurring in the judgment of the Court, indicated execution of the innocent would not transgress the Constitution. 506 U.S. at 427-430. The majority of the Court simply assumed violation, without deciding the issue.

Joint Memorandum in Support of Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody - Page 44

205, 96 L.Ed. 183 (1952), or interferes with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Additionally, even when government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it still must be implemented in a fair manner. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This requirement traditionally is denominated "procedural due process." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Both procedural and substantive due process provide bases for constitutional exoneration of a prisoner with a clear and convincing claim of actual innocence.

**c.    Procedural Due Process**

Criminal process is deficient when it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445-446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (quoting *Patterson v. New York*, 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). The province and duty of the judiciary is to correct its own errors. Barring a prisoner with a genuine claim of actual innocence without offering a procedure for vindication of that claim by judicial review offends fundamental principles of justice.

A balancing of relevant interests reveals the necessity of recognizing a claim to procedural due process. Certainly, the State's interest in finality is important, but a society that knowingly imprisons the innocent cannot call itself just. The interest to the prisoner is paramount: No price can be placed on freedom. Further, the State has an interest in liberating the innocent: Any democratic society by definition cherishes freedom and abhors imprisoning the innocent. Finally, the cost to the State is slight. The judiciary will confront litigation of only a very few claims that satisfy an extraordinarily high standard.

Simply stated, the procedural component of the Due Process Clause mandates habeas relief for the actually innocent. A society cannot call itself free if it knowingly imprisons the innocent without providing a judicial venue in which to raise solid claims of innocence.

**d.** **Substantive Due Process**

Principles of substantive due process compel a like conclusion. "'[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points. . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . .'" *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (quoting *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (opinion dissenting from dismissal on jurisdictional grounds)). Knowingly to imprison the innocent is an arbitrary imposition and purposeless restraint. As the Court recognized in *Elizondo*, a constitutional society founded on due process simply cannot tolerate punishing the innocent. *See Elizondo*, 947 S.W.2d at 209.

Concededly, Justice Rehnquist, writing for the Court in *Herrera*, included some language tending to indicate substantive due process did not apply to analysis of the issue of whether federal habeas relief extended to claims of actual innocence. *See* 506 U.S. at 400-01. However, the comments begged the essential question – does imprisonment of the actually innocent violate the Constitution – and were predicated on concerns of federalism and the starkly limited nature of federal habeas corpus, neither of which is extant in state writs under Art. 11.07 or 11.071, Tex. Code Crim. Proc. Thus, Justice Rehnquist's exposition does not preclude recognition on the State level of a substantive due process claim.

Further, the Justice Rhenquist's reasoning is not sound. The Court disclaimed substantive due process as a source of recognition of freestanding innocence claims because a person convicted in a constitutionally fair trial is legally guilty. In other words, the actual innocence construct presupposes legal guilt. Thus, the Court reasoned, no question could arise regarding punishment of an innocent person. *Id.* at 407 n. 6. The very issue was whether the applicant was in fact innocent.

As the *Herrera* dissent underscored, however, the habeas applicant does not attack the jury verdict. What he wants is a new trial based on newly discovered evidence which he claims proves his innocence. However, the question is not whether the Constitution forbids punishment of a person who is legally guilty but factually innocent but whether it denounces punishing one who would be found legally innocent if tried today. *See* Charles R. Morse, *Habeas Corpus and "Actual Innocence":* Herrera v. Collins, 113 S.Ct. 853 (1993), 16 Harv. J. L. and Pub. Pol'y 848 (1993). The focus is on the present, not on the prior trial. This issue is amenable to substantive due process analysis.

In any event, the Court conceded that "a truly persuasive demonstration of 'actual innocence'" would make a conviction unconstitutional. *Herrera*, 506 U.S. at 417. A "truly persuasive demonstration of innocence" undermines the construct of legal guilt to the extent that, at some point, it disappears. Application of principles of substantive due process is then invited. *See People v. Washington*, 171 Ill.2d 475, 488-489, 665 N.E.2d 1330 (1996). In the face of extraordinary evidence of actual innocence, denial of a judicial forum eviscerates due process.

This holding does not extend the Due Process Clause to "require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *See Patterson v. New York*, 432 U.S. 197, 208, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). This Court carefully balances the interests of the prisoner in access to a forum to test the most basic justice of

a sentence[14] and the interest of the State in finality and efficiency by granting relief in only the most extraordinary cases. Adherence to this standard assures the courts will not be overburdened with frivolous claims.

Habeas is the essential and the only viable means of vindicating actual innocence claims. "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness." *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 97, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Stevens, J., concurring). Habeas corpus is the last judicial inquiry into the validity of a criminal conviction, the final opportunity of the courts to correct their inevitable errors.

The system of executive clemency cannot accomplish this function. While the Court in *Herrera* called executive clemency the "fail safe" in our criminal justice system, 506 U.S. at 391, the Court did not hold that this device satisfies the commands of the Fourteenth Amendment, and the dissent persuasively argued it does not. As the majority concedes, "'A pardon is an act of grace.'" 506 U.S. at 413. The vindication of the actually innocent that is constitutionally commanded cannot be made to turn on the unreviewable discretion of an executive official or administrative tribunal. In *Ford v. Wainwright,* the Court recognized this, explicitly rejecting the argument that executive clemency was adequate to vindicate the Eighth Amendment right not to be executed if one is insane. 477 U.S., at 416, 106 S.Ct. at 2605. The possibility of executive clemency "exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless." *Solem v. Helm,* 463 U.S. 277, 303, 103 S.Ct. 3001, 3016, 77 L.Ed.2d 637 (1983).

---

[14] *See Kuhlmann v. Wilson*, 477 U.S. 477 U.S. 436, 452, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

A like result follows in a due process analysis.  "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).  As the *Herrera* dissent recognized, we no longer live under a government of laws if the exercise of a legal right turns on "an act of grace." 506 U.S. at 440.  "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."  *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

The Courts turn the Constitution on its head if it vests in the unreviewable discretion of executive officials the province of correcting the errors of the judiciary.  The very concept of constitutional government is undermined.  If the judicial system erred in convicting the innocent, the judicial system must correct its error.  Habeas corpus stands as the only viable basis for achieving due process relief.

**Evidence Establishing Innocence**

The evidence establishing innocence is that discussed in detail in the previous Grounds.  As explained there, the government presented no evidence proving that Hamas controlled the Zakat Committees.  This was a crucial element of the charges and the failure to prove this establishes that the verdict in this case was returned and sentence imposed in violation of the due process clause of the United States Constitution, amends. V and XIV.

Moreover, the new evidence of the witnesses in the West Bank who have actual knowledge that Hamas did not control the Zakat Committees further establishes these defendants actual innocence in this case.  The affidavits from these witnesses is newly available evidence that shows

that Hamas did not control the committees. This further proves the defendants' actual inoncence in

this case.

## GROUND FOUR

The government suppressed exculpatory evidence.

## ARGUMENT AND AUTHORITIES

a.    **Legal Standards**

The seminal case concerning suppression of exculpatory evidence is *Brady v. Maryland*, 373

U.S. 83 (1963). In *Brady*, the court stated:

> "We now hold that the suppression by the prosecution of evidence favorable
> to an accused upon request violates due process where the evidence is material either
> to guilt or to punishment, irrespective of the good faith or bad faith of the
> prosecution."

*United States v. Bagley*, 473 U.S. 667 (1985) clarified the standard of review when

exculpatory evidence is suppressed. First, the *Bagley* court rejected a distinction between cases

when there was a specific request for exculpatory evidence and no request. *Bagley* set out a three

part test for obtaining relief based on suppression of exculpatory evidence. (1) The prosecution

withheld or suppressed evidence. (2) The evidence was favorable to the defense. (3) The evidence

was material to either guilt or punishment. In *Bagley*, the prosecution had not disclosed incentives

which had been offered witnesses contingent on the government's satisfaction with their testimony.

In *Bagley*, the Court expressed concern with "any adverse effect that the prosecutor's failure

to respond (with exculpatory evidence) might have had on the preparation of the defendant's case."

473 U.S. at 683. *See also*, *Derden v. McNeel*, 938 F.2d 605, 617 (5th Cir. 1991) (a reviewing court

may consider any adverse effects the prosecutor's failure to release information might have had on

the defendant's preparation and presentation of the case).

In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court discussed the showing necessary to obtain a new trial when the prosecution withholds exculpatory evidence. Under *Kyles,* this showing does not require a demonstration that the disclosure of this evidence would have resulted in an acquittal. Rather, as the Court stated, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434, 115 S.Ct. at 1566. The *Kyles* court restated the materiality test as a determination as to whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 433 (citing *Brady* at 473 U.S. at 682). The Court emphasized that this was not a sufficiency of the evidence test and did not require a showing that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See also*, *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) (Defendant entitled to any exculpatory evidence in child welfare agencies files); *Smith v. Cain*, 132 S.Ct. 627 (2012) (finding suppression of exculpatory evidence); *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*Brady* requires the government to disclose evidence which relates to impeachment as well as exculpatory evidence). It also applies to evidence known only to the police and not the prosecutors.

Knowledge of government agents, such as police officers, of exculpatory evidence is imputed to the prosecution. *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980).

Additionally, the duty to disclose exculpatory evidence is ongoing and the government must disclose it whenever it is discovered. *Imbler v. Pachtman*, 424 U.S. 409 (1976) (after conviction is obtained prosecutor is bound by the ethics of his offices to inform the appropriate authorities of after acquired information that casts a doubt on correctness of conviction.

In *United States v. Harry*, 927 F.Supp.2d 1185 (D.N.M. 2013), the Court stated:

"[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). The "prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request." *United States v. Summers*, 414 F.3d 1287, 1304 (10th Cir. 2005) (citing *Scott v. Mullin*, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution.'" *United States v. Padilla*, 2011 WL 1103876, at 7 (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).

*United States v. Safavian*, 233 F.R.D. 12 (D.C. Cir. 2005), stated:

Under *Brady*, the prosecutors have an affirmative duty to search possible sources of exculpatory information, including a duty to learn of favorable evidence known to others acting on the prosecution's behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government "closely aligned with the prosecution." *United States v. Brooks*, 966 F.2d at 1503 ("affirmative duty of inquiry"). *See United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) ("[i]nformation possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case" for *Brady* purposes); *United States v. Jennings*, 960 F.2d at 1490 ("[t]his personal responsibility cannot be evaded by claiming lack of control over the files . . . of other executive branch agencies").

*See also*, *United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) (Prosecutors *Brady* obligations include not only duty to disclose exculpatory information, but also duty to search possible sources for such information).

b.    **Factual Argument**

There is no question that the government had within its possession and control exculpatory evidence that was not turned over to the defense. This exculpatory evidence is in two broad categories that the defense is able to identify. The first is the years of phone conversations intercepted by the government during the lengthy covert investigation of the Holy Land Foundation. There are phone calls involving some of the defendants where comments are made that indicate a

desire to follow the law and a belief that they are following the law. One such conversation was in evidence but there are, no doubt, many more. The government, through their classification of these calls, denied the defendant's access to the calls in order that all of these exculpatory conversations could be located for use at trial.

The second area of exculpatory evidence is the material in a warehouse in Israel, under the control of the Israeli Defense Forces, that was taken by the Israeli Defense Forces from the offices of the Zakat Committees. The Israeli Defense Forces made this material available to the U. S. government prosecutors, but the defense did not have access to this. There was evidence from at least one witness, Edward Abdington, that he had been in the Zakat Committees and had seen pictures of Yasser Arafat and other Fatah material. This type of evidence is exculpatory since it shows that Hamas does not control the committees since Fatah and Arafat are enemies of Hamas. However, none of this material was ever produced or provided to the defense. The Israeli Defense Forces are aligned with the government and are agents of the government for purposes of this *Brady* analysis.

When the government is in exclusive control of a large amount of potential evidence that the defense does not have access to, there is a constitutional imperative that this evidence be reviewed and examined and that all exculpatory evidence located be turned over to the defense. This requires the government to actually listen to all of the phone conversations in order to identify exculpatory evidence. And it requires the government to review all of the material in the warehouse in Israel to identify exculpatory evidence.

The suppression of this exculpatory evidence and denying the defendants access to it themselves in order that they can find it, constituted a violation of due process.

## GROUND FIVE

The Court of Appeals engaged in an improper harm analysis on appeal resulting in a denial of due process.

## ARGUMENT AND AUTHORITIES

Just as a District Court can take action that results in a denial of due process, so can the Court of Appeals.  That is precisely the situation in this case.  By engaging in an egregiously improper harmless error analysis, the Court of Appeals has effectively denied the defendants a meaningful appeal and affirmed convictions, that, by any proper and reasonable measure of harm, should have been reversed on appeal.

The serious flaws in the Court of Appeals harm analysis were eloquently explained in the Appellant's Joint Petition for Rehearing En Banc, a copy of which is submitted as an exhibit along with this memorandum.  As set out in the rehearing petition, the Court's harmless error analysis was deeply flawed in the following ways:

1.      The opinion viewed the evidence in the light most favorable to the verdict.  That approach is appropriate when considering a challenge to the sufficiency of the evidence, but it is absolutely wrong when determining whether an error is harmless.

2.      The opinion violated the rule that harmless error review must be based on the record as a whole, not merely these portions that favor the government.

3.      The opinion improperly focused on the sufficiency of the properly admitted evidence to support the facts in dispute.  It is an improper inquiry to simply look at whether there was enough evidence to support the result apart from the affected error.

4.     The opinion ignored the fact that the four items of erroneously admitted evidence marks the key difference between the first trial, at which there was not a single guilty verdict for any defendant on any count, and the second trial at which all defendants were found guilty on all counts.

The Court of Appeals was, in all reality, the last bastion to ensure that the unfairness of the trial was not allowed to stand.  The Court correctly found significant error, yet, by engaging in this clearly improper harm analysis, allowed this error to go uncorrected.  The Constitution demands and expects more from the Court and this constitutional violation should be corrected on this 2255 motion.

## GROUND SIX

The prosecution was brought against the defendants for improper purposes resulting in a denial of due process and equal protection.

## ARGUMENT AND AUTHORITIES

The defendants in the Holy Land Foundation case were prosecuted for one reason, and one reason only:  that they are Muslim.  This selective prosecution is in violation of their right to due process and equal protection of the law under U. S. Constitution, amends. V and XIV.

*United States v. Armstrong*, 517 U.S. 456 (1996) sets out the general rule for establishing a claim of selective prosecution.  *Armstrong* states the following:

- The equal protection clause prohibits a decision to prosecute based on an unjustifiable standard such as race, religion, or other arbitrary classification.

- In order to establish a selective prosecution claim, a defendant must demonstrate that federal prosecutorial policy had a discriminating effect and that it was motivated by a discriminatory purpose.

- To establish a discriminatory effect of prosecution, the defendant must show that similarly situated individuals were not, but could have been, prosecuted.

In support of this selective prosecution argument, the following is at attached as exhibits:

1.      An article entitled, *Countering Religion or Terrorism:  Selective Enforcement of Material Support Laws Against Muslim Charities* by Law Professor Sahan F. Aziz.

2.      Westlaw case notes under 18 U.S.C. §2339B showing that virtually all of the prosecutions under this statute are against Muslims.

3.      Various news articles showing non-Muslims alleged to have committed similar acts that were not prosecuted.

These materials demonstrate that this prosecution is based on selective enforcement against Muslims.  A hearing should be held, and discovery ordered on this issue.  If allowed this discovery and a hearing, the ugly underbelly of this prosecution will be revealed.  These defendants and the Holy Land Foundation were targeted, prosecuted, and imprisoned based on their religion.  The United States government has made policy decisions to ignore and not prosecute similar conduct by non-Muslims.  The prosecution in this case was motivated by a discriminatory purpose and had a discriminating effect.

## *NECESSITY FOR AN EVIDENTIARY HEARING*

A claim of ineffective assistance of counsel normally requires an evidentiary hearing in order to fully develop the facts.  The same is true of claims of suppression of exculpatory evidence and a contention of vindictive prosecution.  Based upon the factual and legal arguments made in this motion, an evidentiary hearing should be set in this case.

In *Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir.), cert. denied, 434 U.S. 848, 98 S.Ct. 155, 54 L.Ed.2d 115 (1977), the court stated that a District Court in a federal habeas corpus case should not ordinarily attempt to resolve contested issues of fact without holding an evidentiary hearing.  In *Bauman v. United States*, 692 F.2d 565, 571 (9th Cir. 1982), the court stated that an evidentiary hearing must be held on a §2255 motion "unless viewing the petition against the records,

its allegations do not state a claim for relief or are so palpably incredible or so patently frivolous as to warrant summary dismissal."

The contentions made here are outside the scope of the current trial record in this case. In the face of such allegations, the District Court should hold an evidentiary hearing. This is because:

> "...Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the Untied States attorney, <u>grant a prompt hearing thereon</u>, determine the issues and make findings of fact and conclusions of law with respect thereto..."

28 U.S.C. §2255 (emphasis added).

In *United States v. Day*, 969 F.2d 39, 41 (3rd Cir. 1992), the court stated the following:

> "We have described the District Court's duty, and our standard of review, as follows: When a motion is made under 28 U.S.C. § 2255 the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record. Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.... Accordingly we review this matter to determine if the trial court abused its discretion in not ordering a hearing. *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3rd Cir. 1989)(citation omitted). See also Rule 4(b) of the Rules Governing Section 2255 Proceedings."

Under the standards cited above, the defendants have clearly demonstrated that they are entitled to a hearing on this motion.[15]

---

[15] *See, Fontaine v. United States*, 411 U.S. 213, 215 (1973)(reversing summary dismissal and remanding for hearing because "motion and the files and records of the case [did not] conclusively show that the petitioner is entitled to no relief"); *Sanders v. United States*, 373 U.S. 1, 19-21 (1963); *Ciak v. United States*, 59 F.3d 296, 306-07 (2d Cir. 1995)(district court should have granted evidentiary hearing because movant "alleged facts, which, if found to be true, would have entitled him to habeas relief"); *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994)(district court erred by denying evidentiary hearing on allegations of ineffective assistance that were neither inadequate on their face nor conclusively refuted by record); *United States v. Blaylock*, 20 F.3d 1458, 1465, 1469 (9th Cir. 1994)(district court abused discretion by denying evidentiary hearing on claim of ineffective assistance of counsel which, assuming accuracy of factual allegations, provided basis for relief); *Government of Virgin Islands v. Weatherwax*, 20 F.3d 572, 573, 580 (3d Cir. 1994)(same as *Blaylock*), *Frazer v. United States*, 18 F.3d 778, 781, 784-85 (9th Cir. 1994)(same as *Blaylock*); *United States v. Essig*, 10 F.3d 968, 976 (3d Cir. 1993)("Generally, if a prisoner's §2255 petition raises an issue of material fact, the district court must hold a hearing to determine the truth of the allegations."); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992)("A motion brought under 28 U.S.C. §2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief."); *Anderson v. United States*, 948 F.2d 704 (11th Cir. 1991)(movant entitled to evidentiary hearing because "record does not conclusively show that [his] contentions are without merit"); *Murchu v. United States*, 926 F.2d 50, 57 & n.12 (1st Cir.), cert. denied, 502 U.S. 828 (1991)(movant entitled to hearing); *United States v. Bigman*, 906 F.2d 392, 394 (9th Cir. 1990)(hearing required unless record "conclusively establish[es]" that movant's allegations are false); *United States v. Aiello*, 900 F.2d 528,

## CONCLUSION

All five of these defendants were unjustly convicted, after a demonstrably unfair trial. The basic constitutional rights guaranteed to all persons in the American criminal justice system were violated in numerous ways. For this reason, this Motion Under 28 U.S.C. §2255 should be granted.

Respectfully submitted,

_____/s/ Gary A. Udashen_____
GARY A. UDASHEN
Texas State Bar No. 20369590

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

Attorney for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Joint Memorandum in Support of Motion U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence By A Person in Federal Custody, was electronically delivered to the United States Attorney's Office, 1100 Commerce Street, Suite 300, Dallas, Texas 75242, on this the 25th day of October, 2013.

_____/s/ Gary A. Udashen_____
GARY A. UDASHEN

---

534 (2d Cir. 1990); *Dziurgot v. Luther*, 897 F.2d 1222, 1225-27 (1st Cir. 1990)(hearing required unless petitioner's allegations, accepted as true, would not entitle the petitioner to relief); *Estes v. Untied States*, 883 F.2d 645, 649 (8th Cir. 1989); *United States v. Popoola*, 881 F.2d 811, 812 (9th Cir. 1989)("An evidentiary hearing 'is mandatory whenever e record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims.'"); *United States v. Marr*, 856 F.2d 1471, 1472 (10th Cir. 1988); *United States v. Barnes*, 662 F.2d 777, 783 (D.C. Cir. 1980); *Stokes v. United States*, 652 F.2d 1, 2 (7th Cir. 1981), *cert. denied*, 464 U.S. 8836 (1983)(reversible error for district court not to hold hearing to resolve genuine factual dispute); *United States v. Baynes*, 622 F.2d 66, 69-70 (3d Cir. 1980) (hearing required if movant's allegations neither "unfounded" nor "clearly frivolous").